## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETHANN LITTLE, | ) | CASE NO. 1:17CV1756 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Elizabethann Little, ("Plaintiff" or "Little"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be VACATED and the case REMANDED for

further proceedings consistent with this decision.

### I.    PROCEDURAL HISTORY

In March 2014, Little filed an application for POD and DIB, alleging a disability onset

date of July 28, 2011 and claiming she was disabled due to "severe chronic depression/anxiety;

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

cervical disc herniation spinal fusion + narrowing canal -CT; three lower lumbar disc herniations sciatic nerve affects; heart disease– heart attack- angina - disab med side effects; upper GI acid reflux; chronic & debilitating venerial herpes; TMJ, chronic for 20 years; appearing after 1st root canal; ADHD and some obsessive compulsive disorders; [and] need 11th root canal– current abscessed infected tooth."  (Transcript ("Tr.") 13, 199, 228.)  The applications were denied initially and upon reconsideration, and Little requested a hearing before an administrative law judge ("ALJ").  (Tr. 13, 124-127, 131-133, 134.)

On June 17, 2016, an ALJ held a hearing, during which Little, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 41-88.)  On July 20, 2016, the ALJ issued a written decision finding Little was not disabled.  (Tr. 13-27.)  The ALJ's decision became final on June 21, 2017, when the Appeals Council declined further review.  (Tr. 1-5.)

On August 22, 2017, Little filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)  Little asserts the following assignments of error:

(1)     The ALJ committed reversible error when the ALJ failed to properly weigh the opinions of claimant's treating physicians.

(2)     The ALJ's credibility determination is not supported by substantial evidence.

(3)     The ALJ erred by failing to address all supported limitations in his RFC analysis.

(Doc. No. 12.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Little was born in January 1967 and was forty-seven (47) years-old at the time of her date

2

last insured, making her a "younger" person under social security regulations. (Tr. 25.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has at least a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a floor covering salesperson (light but performed at medium, semi-skilled, SVP 4). (Tr. 25.)

**B.      Relevant Medical Evidence[2]**

**1.          Physical Impairments**

On December 18, 2010, Little sustained injuries to her neck and back after slipping and falling on a patch of ice. (Tr. 297, 584, 616.) She underwent an MRI of her lumbar spine several days later which showed (1) multilevel discogenic changes of the lumbar spine with bulging disc from L3 through S1; (2) suspected small broad based disc protrusion at L4-5 and L5-S1; (3) mild to moderate narrowing of the central canal at the L4-5 level and mild narrowing of the central canal at L3-4; (5) disc material at L4-5 that "may contact the transiting L4 nerve root on the right, though there is no displacement of the nerve root." (Tr. 413.) An x-ray of Little's cervical spine taken January 13, 2011 showed congenital anterior fusion at C5-6; mild deformity of the C5 and C6 vertebral bodies; mild disc space narrowing of C6-7; and mild bony neural foraminal stenosis on the left at C4-5 and C5-6. (Tr. 410.)

The record reflects Little received chiropractic treatment from Michael Masterson, D.C., from January 2011 through January 2012. (Tr. 302-316.) She complained of intense pain in her neck, lower back, and left side, which she variously described as disturbing, depressing, debilitating, and unbearable. (Tr. 303, 304.) Treatment records indicate Little initially rated her

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

pain between a 7 and 10 on a scale of 10.  (Tr. 302-316.)  After several months of treatment, Little reported some improvement in her pain levels, rating her pain between a 4 and 7 out of 10 in August and September 2011.  (Tr. 312-315.)

During this time period, Little also presented for treatment at Cleveland Back and Pain Management Center, where her treating pain management physician John Nickels, M.D., practiced.  (Tr. 681-685.)  In March 2011, Little complained of lower back, neck, and facial pain stemming from her December 2010 accident.  (Tr. 685.)  She rated her pain an 8 on a scale of 10, but indicated home therapy was helping.  (*Id*.)  Examination revealed muscle spasms, reduced range of motion in Little's cervical and lumbar spines, and positive straight leg raise on the left.  (*Id*.)  Little's diagnoses included facial pain, cervical myofascitis, lumbar spine myofascitis, depression, lumbar spine radiculopathy, and left shoulder strain.  (*Id*.)  She was prescribed Zanaflex and advised to continue home therapy.  (*Id*.)

Little returned to the Cleveland Back and Pain Management Center in April, May, August, and September 2011.  (Tr. 681-684.)  Physical examination findings and Little's diagnoses were the same as above during each of these visits.  (*Id*.)  Little was prescribed Naproxen and Lortab, advised to continue home therapy, and encouraged to continue treatment with her psychologist.  (*Id*.)

On October 17, 2011, Little established treatment with chiropractor Brian Bennett, D.C.  (Tr. 584-586.)  She presented with chief complaints of neck and back pain that radiated to her left shoulder/arm and left hip, headaches, and sleep disturbance.  (Tr. 584.)  Little indicated her neck pain caused difficulty with "general personal care, reading, lifting, driving, concentrating, and performing her usual work."  (*Id*.)  She also reported increased pain with standing, lifting,

4

walking, sleeping, traveling in a vehicle, and engaging in "more energetic social activities." (Tr. 585.) On examination, Mr. Bennett noted difficulty changing positions from sitting to standing, but otherwise normal station/gait; pain upon palpation over the lower cervical and upper thoracic spine with associated paraspinal myospasms and guarding; muscular spasms and pain upon palpation through the lumbosacral spine with extension into the left SI joint and hip; increased pain with range of motion; pain with straight leg raise testing; positive Kemp's test bilaterally; and positive shoulder depression testing bilaterally. (Tr. 585-586.)

Mr. Bennett assessed neck sprain and thoracic region sprain. (Tr. 586.) He recommended continued treatment with Dr. Nickels and chiropractic treatment "in the form of ultrasound, electrotherapy, mysofascial release and gentle manipulation procedures." (*Id.*) Mr. Bennett also requested an MRI of Little's cervical spine, which Little underwent on October 27, 2011. (Tr. 318-319.) This imaging revealed (1) congenital block vertebra at C5-6; and (2) a broad based left central disc herniation at C6-7. (*Id.*)

Little returned to Mr. Bennett on December 9, 2011, with continued complaints of neck and back pain, tingling in her upper extremities, and severe headaches. (Tr. 581-582.) Physical examination findings were similar to Little's previous visit, including pain to palpation and muscle spasm in her cervical and lumbar spines, increased pain with compression through the neck and upper back, positive Jackson's and Spurling's compression tests bilaterally, positive shoulder depression testing bilaterally, and pain with straight leg raise testing. (*Id.*) Mr. Bennett prescribed a traction unit, and requested an EMG/NCV of Little's upper extremities. (*Id.*)

On February 16, 2012, Little presented to Mark Grubb, M.D., for evaluation of her neck and left arm pain. (Tr. 616.) On examination, Dr. Grubb noted tenderness to palpation in Little's

5

neck, positive Spurling maneuver, intact motor strength, normal reflexes, normal shoulder range of motion, and intact pulses. (*Id.*) He assessed cervical herniated disc, cervical sprain/strain, and thoracic sprain/strain; and recommended "continued nonoperative management." (*Id.*)

Little returned to Mr. Bennett on numerous occasions in 2012. (Tr. 563- 578, 579-580, 554-561.) Although she reported some improvement, Little continued to complain of pain through her neck and back with radiating symptoms into her left upper extremity including pain and numbness/tingling. (*Id.*) Physical examination findings were similar to Little's previous visits, including pain to palpation and muscle spasm in her cervical and lumbar spines, increased pain with compression through the neck and upper back, positive Jackson's and Spurling's compression tests bilaterally, pain with range of motion, positive shoulder depression testing bilaterally, and pain with straight leg raise testing. (Tr. 554-555, 557, 560-561, 563, 566, 567-568, 570, 573, 574, 575-576..) Mr. Bennett also noted mild weakness of Little's left elbow and wrist, as well as reduced strength and endurance through her cervical and lumbar spines. (Tr. 576, 568, 561.)

On April 13, 2012, Little underwent an MRI of her thoracic spine, which was normal. (Tr. 598.) Shortly thereafter, on April 23, 2012, she underwent a Nerve Conduction Study ("NCS") of her upper extremities. (Tr. 596-597.) The NCS indicated Little was suffering from bilateral cervical radiculitis, bilateral thoracic outlet syndrome, and mild peripheral nerve compression of the right median nerve at the level of the wrist (consistent with carpal tunnel syndrome). (Tr. 597.) On August 10, 2012, Little underwent an MRI of her lumbar spine. (Tr. 594-595.) This imaging revealed disc herniations at L3-4, L4-5, and L5-S1. (*Id.*)

After Little complained of severe lower back pain radiating into her lower extremities,

Mr. Bennett requested an NCS of her bilateral legs.  (Tr. 588-589.)  Little underwent an NCS on

August 22, 2012, which showed radiculitis/radiculopathy of the L5 and S1 nerve roots.  (*Id*.)

On August 30, 2012, Little presented to M.G. Salka, M.D., for evaluation of chest pain

and abnormal EKG.  (Tr. 874-875.)  Little's lungs were clear and her heart sounds were normal.

(*Id*.)  Based on the abnormal EKG, however, Dr. Salka prescribed nitroglycerin and ordered a

perfusion study.  (*Id*.)  Little underwent a stress nuclear myocardial perfusion study on

September 6, 2012, which was abnormal.  (Tr. 884-885.)  On September 19, 2012, Dr. Salka

performed a cardiac catheterization and stent placement.  (Tr. 391-394, 342-344.)  Dr. Salka

diagnosed coronary artherosclerotic disease.  (Tr. 393.)

The record reflects Little returned to Mr. Bennett on numerous occasions in the first half

of 2013.  (Tr. 548-553, 462-468.)  She reported fluctuating pain levels in her neck, back,

shoulders, and arms.  (*Id*.)  Little continued to complain of significant difficulty with daily

activities, such as personal care, standing, sitting, walking, lifting, driving, concentrating,

reading, and sleeping.  (Tr. 551, 548, 466.)  Physical examination findings included normal

station/gait;  pain to palpation and muscle spasm in her cervical, thoracic and/or lumbar spines;

increased pain with compression through the neck and upper back; positive Jackson's and

Spurling's compression tests bilaterally; pain with range of motion; positive shoulder depression

testing bilaterally; reduced sensitivity to sharp sensation in C6 and C7; trigger points; and

reduced strength.  (Tr. 548-549, 551-552, 466-467.)  An x-ray of Little's lumbar spine showed

disc space narrowing at L3-4 and L5-S1.  (Tr. 475.)

On March 21, 2013, Little reported "overall improvement" after receiving injections from

Dr. Nickels.  (Tr. 550.)  Later that month, however, Little returned to cardiologist Dr. Salka with

7

complaints of neck and shoulder discomfort and pain which she feared was angina.  (Tr. 872-873.)  Cardiovascular examination findings were normal.  (*Id*.)  Dr. Salka strongly suspected somatic pain, "probably related to increased stress and patient's underlying bipolar disorder."  (*Id*.)  She provided reassurance and recommended re-evaluation in six to eight months.[3]  (*Id*.)

On June 4, 2013, Little returned to Dr. Nickels for evaluation of her radiating neck and back pain, which she rated a 6 on a scale of 10.  (Tr. 668-672.)  Examination findings included tense/tight neck muscles; normal muscle bulk/tone and full range of motion in Little's upper extremities; normal sensation and reflexes; negative straight leg raise; a "stiff/steady gait;" no tenderness in her lumbar spine; normal motor strength in her lower extremities; and tight back muscles.  (Tr. 670-671.)  Little reported her pain medication was adequate.  (Tr. 671.)

On July 5, 2013, Little presented to Michael Steinmetz, M.D., for evaluation of her neck and left arm pain.  (Tr. 609-615.)  She reported she "is unable to function due to these complaints and now has intermittent but persistent pain and her arm is painful after use and she is unable to do activity due to this."  (Tr. 609.)  Examination revealed no edema; full motor strength in her bilateral upper and lower extremities; decreased sensation in her left shoulder and outer arm; normal gait; and negative straight leg raise.  (Tr. 611-612.)  Dr. Steinmetz determined she "may very likely benefit from surgical intervention," and offered surgery to address her herniated disc at C6-C7.  (Tr. 612.)  With respect to Little's complaints of lower back pain, Dr. Steinmetz recommended facet blocks and physical therapy.  (*Id*.)

Shortly thereafter, on July 16, 2013, Little returned to Dr. Nickels with complaints of

---

[3] The record reflects Little underwent an ultrasound of her carotid arteries in June 2013,which found "estimated stenosis of each internal carotid artery [of] less than 16%." (Tr. 883.)

8

worsening pain in her lower back, increased with prolonged standing.  (Tr. 666-667.)

Examination revealed a stiff gait, tenderness in her thoracic and lumbar spines with spasm,

reduced lumbar range of motion, normal motor strength, normal reflexes, negative straight leg

raise bilaterally, and positive compression testing bilaterally.  (Tr. 667.)  Dr. Nickels continued

Little on her medications.  (*Id.*)

On August 13, 2013, Little presented to Dr. Nickels for a trigger point injection.  (Tr.

663-664.)  Two weeks later, on August 27, 2013, Little returned to Dr. Nickels with complaints

of neck and back pain, which she rated an 8 on a scale of 10.  (Tr. 658-661.)  Examination

revealed a stiff gait, tight back muscles, reduced lumbar range of motion, normal motor strength,

normal reflexes, negative straight leg raise bilaterally, positive compression testing bilaterally,

tenderness to palpation in Little's cervical spine, reduced cervical range of motion, and

tight/tense neck muscles.  (Tr. 660.)  Dr. Nickels again continued Little on her medications.[4]  (Tr.

661.)

On September 23, 2013, Little underwent neck surgery; i.e., a C6-7 anterior cervical

diskectomy and interbody arthrodesis.  (Tr. 605-607.)

On October 8, 2013, Little returned to Dr. Nickels.  (Tr. 655-658.)  She was very upset

and tearful and rated her pain an 8 on a scale of 10.  (Tr. 657.)  Examination revealed tenderness

and reduced range of motion throughout her cervical spine.  (*Id*.)  Dr. Nickels increased her

Baclofen to address post-operative spasms, and authorized a short course of Percocet for

--------

[4] The record reflects Little continued to treat regularly with Dr. Bennett between June and
September 2013.  (Tr. 541-546.)  She complained of fluctuating neck and back pain,
radiating to her upper and lower extremities.  (*Id*.)  Examination findings during this time
period were similar to those in Little's previous visits.  (*Id*.)

breakthrough pain. (*Id.*) On that same date, Little's psychiatrist Eduardo Vazquez, M.D., prescribed a regimen of home health care for the period October 8, 2013 through December 6, 2013, based on Little's anxiety and surgical procedure. (Tr. 707-710.)

Little returned to Dr. Nickels on November 5, 2013. (Tr. 652-655.) She reported constant, but reduced, pain, which she again rated an 8 on a scale of 10. (Tr. 653.) Examination revealed antalgic gait and limping; exaggerated lumbar lordosis; tenderness and reduced range of motion in the lumbar spine; positive compression testing; positive straight leg raise on the right; tenderness and reduced range of motion in the cervical spine; and reduced neck strength. (Tr. 654.) Dr. Nickels authorized continued treatment with Percocet. (Tr. 655.)

Two days later, on November 7, 2013, Little returned to Dr. Steinmetz for a post-operative visit. (Tr. 603-604.) Examination revealed normal gait, normal reflexes and motor strength in her upper and lower extremities, and no joint swelling or muscle weakness. (*Id.*) An x-ray of Little's cervical spine taken that date showed "evidence for cervical spine instrumentation with a discectomy at C6-C7 with interval graft placement and an anterior fusion plate and screws spanning C6-C7," prior fusion at C5-C6, no acute fracture, no alignment change, and some prevertebral soft tissue prominence. (Tr. 604.) Dr. Steinmetz found Little was "progressing well" and noted "her pain symptoms have improved with complete resolution of radicular pain and neck pain/stiffness." (*Id.*) He noted "any pain that she continues to have is well controlled on current at home pain regimen."[5] (*Id.*)

_____

[5] The record also reflects Little participated in regular physical therapy session between November 21, 2013 and April 16, 2014. (Tr. 494-525.) Little's physical therapist (whose name is illegible) noted moderate tenderness to palpation in Little's cervical and thoracic spines, reduced range of motion in her cervical spine, and reduced grip strength bilaterally. (Tr. 529, 533, 526.)

Little returned to Dr. Nickels on December 3, 2013 with complaints of increased muscle spasms in her neck and chest, radiating lower back pain, and occasional numbness in her left arm. (Tr. 648-651.) On examination, Little was "very uncomfortable, tearful and openly crying." (Tr. 650.) She had an antalgic gait and limp, exaggerated lumbar lordosis, tenderness and reduced range of motion in her cervical and lumbar spines, positive compression testing, and positive straight leg raise on the right. (*Id*.) Dr. Nickels continued Little on Percocet and noted she had been approved for physical therapy and massotherapy. (Tr. 651.)

On December 19, 2013, Dr. Steinmetz and Maggie Carmody, M.D., found Little was doing well. (Tr. 425-426.) Dr. Carmody noted Little's "left arm pain is still completely resolved" and "her neck pain improved dramatically and then plateaued." (*Id*.) Dr. Steinmetz noted she had "low back issues" and advised her to increase her physical therapy. (*Id*.)

On December 23, 2013, Little returned to cardiologist Dr. Salka and reported "doing well." (Tr. 869-870.) Cardiovascular examination was normal, although an EKG showed some borderline results. (*Id*.)

That same month, Dr. Vazquez renewed Little's prescription for a regimen of home health care, extending it from December 7, 2013 until February 4, 2014 due to Little's anxiety and surgical procedure. (Tr. 711-714.) He noted she had gained "better mobility in her neck and back since her procedure," but "continues to express anxiety and depression with frequent crying episodes." (Tr. 713.)

On January 7, 2014, Little returned to Dr. Nickels with complaints of constant, aching neck pain and muscle spasms. (Tr. 643-647.) She was very uncomfortable, in distress, tearful and openly crying. (Tr. 646.) Examination again revealed antalgic gait and limp, exaggerated

11

lumbar lordosis, tenderness and reduced range of motion in her cervical and lumbar spines, positive compression testing, and positive straight leg raise on the right.  (*Id*.)  Dr. Nickels continued Little on Percocet.  (Tr. 647.)  Little returned to Dr. Nickels on February 4, 2014, reporting neck and back pain as well as weakness in her left arm.  (Tr. 639-643.)  She was very uncomfortable and sitting with a rigid posture.  (Tr. 641.)  Examination findings were largely the same as her previous visit.  (Tr. 641-642.)  Dr. Nickels requested authorization for another round of trigger point injections, which Little underwent on February 19, 2014.  (Tr. 643, 636-639.)

Little returned to Dr. Nickels on March 4, 2014 and reported some relief as a result of the injections.   (Tr. 632-635.)  Examination still, however, revealed antalgic gait and limp, as well as tenderness, reduced range of motion, positive compression testing, and positive straight leg raise on the left.  (Tr. 634.)

On March 20, 2014, Little presented to Dr. Steinmetz for follow-up regarding her lumbar spine.  (Tr. 417.)  He noted Little was "still having considerable lumbar pain," despite doing "some yoga and exercises."  (*Id*.)  Dr. Steinmetz prescribed facet blocks and ordered a CT of her cervical spine.  (Tr. 417, 420.)  Little underwent the CT shortly thereafter, which suggested "borderline significant left neuroforaminal stenosis" in the C6-7 region.  (Tr. 587.)

Little returned to Dr. Nickels on April 1 and 29, 2014.  (Tr. 623-631.)  On both occasions, she was in distress and "appeared to be in pain."  (Tr. 625, 629.)  Physical examination findings were largely the same as her previous visits, including antalgic gait and limp, tenderness, reduced range of motion, positive compression testing, and positive straight leg raise on the left.  (*Id*.)  Dr. Nickels continued Little on Percocet.  (Tr. 631.)

On July 10, 2014, Little presented to cardiologist Dr. Salka with complaints of chest pain.

12

(Tr. 907-908.)  Cardiovascular examination findings were normal but an EKG performed that date was abnormal.  (*Id*.)  Little underwent a cardiac catheterization and percutaneous coronary intervention ("PCI") the next day.  (Tr. 916-919.)  The PCI revealed "markedly abnormal" fractional flow reserve results, "consistent with hemodynamically severe disease."  (Tr. 919.)  Little returned to Dr. Salka on July 31, 2014 with complaints of lightheadedness and atypical chest pain.  (Tr. 905-906.)  Dr. Salka adjusted her medications.  (*Id*.)

On August 26, 2014, Little underwent an MRI of her cervical spine.  (Tr. 979-980.)  This imaging revealed (1) a left central disc herniation at C4-5 with no cord compression, foramen stenosis, or impingement of the exiting nerve roots; and (2) a developmental block vertebra at C5-6.  (*Id.*)

On September 11, 2014, Little underwent a stress nuclear study which showed positive electrocardiographic ischemic response to exercise and questionable angina.  (Tr. 924.)  Less than a week later, on September 17, 2014, Little underwent another cardiac catheterization.  (Tr. 912-915.)  On October 20, 2014, Little again complained of dizziness.  (Tr. 904.)  Dr. Salka advised her to continue her current medical regimen.  (*Id*.)  On November 16, 2014, Dr. Salka completed a questionnaire regarding Little's heart condition.  (Tr. 901-903.)  Dr. Salka noted Little experienced both chest discomfort and dyspnea after walking less than one block.[6]  (Tr.

---

[6] The record also reflects Little continued to regularly present to Mr. Bennett throughout 2014.  (Tr. 460-461, 458-459, 539, 537-539, 534-536, 1252-1253.)  During this time period, Little complained of pain in her neck and lower back that fluctuated with her degree of activity.  (*Id*.)  Examination findings included difficulty changing positions, muscle spasms, guarding, positive Kemp's testing, pain with range of motion, pain with palpation, and positive compression testing.  (*Id*.)  Little did, however, report some improvement, particularly with regular physical therapy and treatment.  (Tr. 538, 539, 458, 534-535.)

902.)

On January 22, 2015, Dr. Nickels administered facet steroid injections in Little's lumbar spine.  (Tr. 968-971.)  Several months later, on May 27, 2015, Little underwent an MRI of her cervical spine, which revealed disc bulging at C4-5.  (Tr. 1255.)

On July 8, 2015, cardiologist David B. Joyce, M.D., submitted a letter regarding Little's physical functional limitations.  (Tr. 942.)  Dr. Joyce indicated Little suffered from coronary artery disease and "remain[ed] plagued with intermittent chest discomfort, currently well controlled on medication."  (*Id*.)  Dr. Joyce opined as follows: "She should avoid heavy physical work such as lifting anything more than about 10 pounds, climbing ladders, or regular physical exertion.  Walking short intervals carrying light packages would be reasonable."  (*Id*.)

On July 20, 2015, Dr. Nickels submitted a letter and completed a questionnaire regarding Little's physical impairments.  (Tr. 950-958.)  In his letter, Dr. Nickels provided a lengthy description of Little's symptoms, pain complaints, and treatment course. (Tr. 950-951.)  He summarized his findings and conclusions as follows:

> Throughout  the course of her treatment in our office, Ms. Little has shown evidence of persistent discomfort in the neck and bilateral upper extremities.  Her pain further radiates into the left upper extremity to the level of the elbow.  She has pain in the low back which radiates across the bilateral hips and into the left lower extremity to the level of the knee.
>
> Her pain is described as constant with a quality of aching, burning, sharpness and stabbing.  She discloses feeling weakness in the neck, left upper extremity, low back and left leg and numbness in the left upper extremity.  Her pain is increased with turning the head to the left, reaching overhead, extending the arms, repetitive motion with the hands and arms, twisting, and bending forward, prolonged weight bearing prolonged activity and when she is stressed.  Pain is reduced with resting, use of heat, massage, TENS unit, stretching and the use of medications.  Her [pain rating] is 6/10.  Ms. Little discloses that she typically sleeps 2 hours at a time due to pain in her neck.  She has been complaining of excessive daytime fatigue.

14

> Throughout the course of her treatment in our office, we are aware that Ms. Little has been managed with use of a TENS unit, physical therapy, chiropractic care, medical management, surgical intervention, cardiac intervention, and counseling. She continues to decline from a functional standpoint and now has difficulty completing [activities of daily living] such as cooking and vacuuming.
>
> In review of the information regarding Ms. Little and her treatment history in our office, it is my medical opinion and to a reasonable degree of medical certainty that Ms. Little is not able to function in a manner that would allow her to pursue gainful employment in any capacity.  It is my impression that Ms. Little has a guarded prognosis as far as her pain and physical limitations and a potentially more detrimental prognosis [in]consideration of her current cardiac issues.
>
> Her functional limitations include standing for more than 30 minutes at a time, walking for more than 30 minutes at a time, lifting, twisting, bending, squatting, crawling, and climbing.  She is not able to reach above shoulder level and is not able to remain active for an 8 hour workday.  Due to issues in the cervical spine, she is not able to perform fine or gross manipulation for any extended period of time.

(Tr. 951.)

In the questionnaire portion of his opinion, Dr. Nickels opined Little could (1) stand for 2 hours total and for 30 minutes at one time during an 8 hour workday; (2) walk for 2 hours total and for 30 minutes at one time during an 8 hour workday; (3) sit for 4 hours total and for 30 minutes at one time during an 8 hour workday; (4) lift up to 10 pounds occasionally; (5) occasionally bend; (6) occasionally climb; (7) never squat or crawl; and (8) never reach above shoulder level.  (Tr. 953.)  He also opined Little could not use her feet for repetitive movements in foot controls, push/pull, or engage in fine manipulation.  (*Id.*)  Dr. Nickels found Little would be expected to miss two or more days of work per month due to pain, fatigue, medication/treatment side effects or other symptoms.  (Tr. 954.)  He also expressly concluded Little's functional limitations had been present since her July 28, 2011 onset date.  (*Id.*)

Dr. Nickels also completed a separate questionnaire regarding Little's upper extremity limitations.  (Tr. 956-957.)  He opined Little could "seldom" engage in gross and fine

15

manipulation bilaterally, and never engage in any reaching bilaterally.  (*Id*.)  The term "seldom"
was defined on the form as denoting a "serious limitation, i.e., difficulty tying shoes, writing,
buttoning clothes, able to grasp and lift only very small (less than 5 pounds) objects on a sporadic
basis."  (*Id*.)  Again, Dr. Nickels expressly concluded these particular limitations had been
present since Little's July 28, 2011 onset date.  (*Id*.)

### 2.    Mental Impairments

The record reflects Little regularly presented for mental health counseling throughout
2013 and 2014.[7]  During this time period, Little reported fluctuating mental health symptoms.
Treatment records indicate she struggled with a number of issues, including a pattern of abusive
and controlling behavior on the part of her husband, financial pressures, and the physical pain
and uncertainty associated with her cervical, lumbar, and cardiac conditions.  Mental status
examination findings varied during this time period.  In January 2013, Little was tearful with a
labile affect, dysphoric mood, and intermittent eye contact.  (Tr. 361.)  She reported increased
depression due to her "husband's abuse and her own inability to follow through on plans to
establish independence."  (*Id*.)  The following month, she was "feeling better, less depressed and
anxious, more motivated," with a full affect, normal speech, logical thought process, and
euthymic mood.  (Tr. 360.)

Treatment records indicate that, in early 2013, Little was prescribed Cymbalta, Zoloft,
and Wellbutrin.  (Tr. 850.)  In March 2013, Little reported "doing better" and noticing "positive
changes" with Cymbalta.  (Tr. 358, 849.)  In April 2013, however, Little stated she had been

---

[7]  The parties do not direct this Court's attention to any mental health treatment records
prior to January 2013.

"severely depressed for the past several weeks." (Tr. 356.)  She "reported that she had thoughts of death, but was not planning on hurting herself."  (*Id*.)  The next month, Little was "more depressed" and "overwhelmed."  (Tr. 353.)  In June 2013, Little "cried for most of the session," stating she was depressed, overwhelmed, "has little motivation and is very confused."  (Tr. 352.) Later that month, Grace F. Herung, APRN, adjusted Little's medications, increasing Cymbalta, discontinuing Zoloft, and adding Ativan.  (Tr. 848.)

In July 2013, Little was "so depressed over the past two weeks that she didn't shower for 10 days."  (Tr. 351.)  Nonetheless, she reported feeling more productive and noted "her thoughts have become clearer."  (*Id*.)  Later that month, Little was "feeling better, more focused, and able to do more."  (Tr. 350.)  Mental status examinations during this visit included intermittent eye contact, normal speech, linear and logical thought process, improved mood, and full affect.  (*Id*.) In August 2013, Nurse Herung noted Little was calm and cooperative with an improving and congruent mood, "more positive" thought process, and decreased anxiety.  (Tr. 846.)  Nurse Herung also found Little's orientation, memory, attention/concentration, language and speech were "within normal limits," and her judgment and insight were adequate.  (*Id*.)  The following month, Little again reported "feeling better."  (Tr. 348.)

In September 2013, Little reported feeling anxious and sad about her upcoming neck surgery.  (Tr. 346, 845.)  Her orientation, memory, and attention/concentration remained "within normal limits."  (Tr. 845.)  Shortly after her surgery, Little was "in distress," "very uncomfortable," and in considerable pain.  (Tr. 864.)  She reported "she sits and cries most of the day."  (*Id.*)  On October 23, 2013, however, Little was "feeling much better physically."  (Tr. 863.)  During this visit, mental status examination findings included euthymic mood, normal

17

affect, normal speech, linear and logical thought process, normal behavior, intact memory, good

concentration, fair insight, and improving judgment.  (Tr. 863.)  In November 2013, Little

reported "she continues to feel better physically and that has helped her depression."  (Tr. 862.)

Later that month, however, Little called "in distress" because "her husband had threatened her

with physical violence if she didn't leave the house."  (Tr. 860.)  She was "fearful of being

harmed, had no money, and no place to go."  (*Id*.)  The following month, Little was anxious with

a ruminative thought process and fair insight/judgment.  (Tr. 859.)

Meanwhile, on October 8, 2013, Little's psychiatrist, Dr. Vazquez, prescribed a regimen

of home health care for the period October 8, 2013 through December 6, 2013, based on Little's

anxiety and surgical procedure.  (Tr. 707-710.)  Little's home health care treatment records from

2013 indicate diagnoses of anxiety state, unspecified; and major depressive disorder, recurrent

episode, unspecified degree.  (Tr. 810, 777.)  Little is described as having an "impaired mental

state," with symptoms including indecisiveness, lack of concentration, diminished interest in

most activities, poor coping skills, and sleep disturbances.  (Tr. 804, 809, 815-816.)  Little's

home health care providers generally described her as tearful, depressed, and stressed.  (Tr. 822,

805, 801, 797, 794, 790, 774, 770.)  Her home was consistently described as clean and

uncluttered.  (Tr. 805, 801, 797, 794, 790, 786, 774, 770, 766.)

On December 6, 2013, Dr. Vazquez described Little's progress as follows:

Client has been compliant with her homecare visits and medications. Client has
gained better mobility in her neck and back since procedure.  Client continues to
express anxiety and depression with frequent crying episodes. * * * Working with
client on the use of effective coping skills to use to help reduce anxiety and
encouraging client to work on obtaining a better support system.

(Tr. 713.)  Dr. Vazquez renewed Little's prescription for home health care, extending it from

December 7, 2013 through February 4, 2014.  (Tr. 711-714.)  He later extended it again, until

April 5, 2014, due to ongoing tearfulness, poor coping skills, and reports of anxiety and

depression.  (Tr. 715-717.)

       Little's mental health treatment records from 2014 are similar to the previous year.  In

January 2014, Little reported "feeling better" with an ability to "do more lately."  (Tr. 857.)

Mental status examination findings were largely normal.  (*Id.*)  She reported "coping better with

her depression" in February 2014 and feeling "less depressed and more motivated" in March

2014.  (Tr. 855, 856.)   In April, however, Little reported a recent depressive episode.  (Tr. 853.)

Examination findings included subdued mood, constricted affect, fair insight, and poor judgment.

(*Id.*)  The following month, Little was "very stressed" and anxious.  (Tr. 852.)  Her appearance

was unkempt and her mood was subdued with a congruent affect.  (*Id.*)  In June 2014, Little

reported feeling depressed and overwhelmed, with depressive episodes and thoughts of suicide.

(Tr. 1148.)  Examination findings included depressed mood, ruminative thought process,

unkempt appearance, intact memory, fair concentration, and "limited" insight/judgment.  (*Id.*)

       In July 2014, Little's mental health counselor noted subdued mood, constricted affect,

unkempt appearance, intact memory, fair concentration, and fair insight and judgment.  (Tr.

1146.)  The following month, she was depressed and tearful and reported "passive suicidal

ideation."  (Tr. 1144.)  Mental status examination findings included depressed mood, muffled

speech, ruminative thought process, poor memory and concentration, slowed behavior, fair

insight, and poor judgment.  (*Id.*)  In September 2014, Little was anxious with unkempt

appearance, labile affect, ruminative thought process and fair insight and judgment.  (Tr. 1143.)

She reported her husband had threatened to kill her.  (*Id.*)  Later that month, Little again

19

presented as depressed, tearful, and anxious. (Tr. 1142.)

On October 2, 2014, Dr. Vazquez completed a Mental Residual Functional Capacity ("RFC") questionnaire. (Tr. 896-899.) He found Little was markedly[8] limited her abilities to (1) perform and complete work tasks in a normal workday or workweek at a consistent pace; (2) work in cooperation with or in proximity to others without being distracted by them; (3) carry through instructions and complete tasks independently; (4) maintain attention and concentration for more than brief periods of time; (5) perform at production levels expected by most employers; (6) behave predictably, reliably and in an emotionally stable manner; (7) maintain personal appearance and hygiene; and (8) tolerate customary work pressures. (*Id*.) Dr. Vazquez found Little was moderately limited in her abilities to (1) accept instruction from or respond appropriately to criticism from supervisors or superiors; (2) work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; (3) respond appropriately to co-workers or peers; (4) relate to the general public and maintain socially appropriate behavior; (5) process subjective information accurately and to use appropriate judgment; (6) respond appropriately to changes in the work setting; (7) remember locations and workday procedures and instructions; and (8) be aware of normal hazards and take necessary precautions. (*Id*.) Finally, Dr. Vazquez opined Little's condition was likely to deteriorate if she was placed under stress, "particularly that of a job." (Tr. 898.)

On March 10, 2016, Dr. Vazquez completed another Mental RFC questionnaire. (Tr.

---

[8] The form defined the term "marked" as follows: "Impairment seriously affects ability to function in a work setting." (Tr. 896.) The term "moderate" is defined as: "Impairment affects but does not preclude ability to function in a work setting." (*Id*.)

1519-1522.)  In this opinion, Dr. Vazquez concluded Little had an extreme[9] limitation in her abilities to (1) perform and complete work tasks in a normal workday or workweek at a consistent pace; (2) perform at production levels expected by most employers; (3) behave predictably, reliably and in an emotionally stable manner; (4) maintain personal appearance and hygiene; and (5) tolerate customary work pressures.  (*Id.*)  He further found Little was markedly limited in her abilities to work in cooperation with or in proximity to others without being distracted by them; and maintain attention and concentration for more than brief periods of time. (*Id.*)  Dr. Vazquez found Little was moderately limited in all remaining categories.  (*Id.*)

**C.    State Agency Reports**

**1.         Physical Impairments**

On August 13, 2014, state agency physician Venkatachala Sreenivas, M.D., reviewed Little's medical records and completed a Physical RFC Assessment.  (Tr. 101-103.)  Dr. Sreenivas found Little could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 102.)  She concluded Little (1) had an unlimited capacity to push/pull; (2) could frequently climb ramps/stairs, balance, stoop, kneel, and crouch; (3) could occasionally crawl; and (4) could never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Sreenivas found Little had no manipulative, communicative, or environmental limitations.  (Tr. 102-103.)

On November 17, 2014, Michael Delphia, M.D., reviewed Little's medical records and completed a Physical RFC Assessment.  (Tr. 117-119.)  Dr. Delphia reached the same

---

[9] The form defines the term "extreme" as follows: "Retains no useful ability to function in a work setting." (Tr. 1519.)

conclusions as Dr. Sreenivas.  (*Id.*)

### 2.    Mental Impairments

On July 24, 2014, Little underwent a psychological consultative examination with James Spindler, M.S.  (Tr. 888-893.)  Little reported she had been married to her husband for four years and was currently in the process of getting a divorce.  (Tr. 889.)  She stated she "enjoyed high school [and] maintained a 3.20 grade average."  (*Id.*)  Little reported numerous physical impairments, including heart problems, hypertension, acid reflux, and chronic neck pain.  (*Id.*)  With regard to her mental impairments, Little stated she suffered from depression, and was currently receiving outpatient mental health services.  (Tr. 890.)

On mental status examination, Dr. Spindler noted Little was alert and oriented, cooperative, appropriately dressed, and had average grooming habits.  (Tr. 890-891.)  Her speech and thought content were normal, and she "had no apparent difficulty staying focused during the evaluation."  (Tr. 890.)  Little's mood was depressed.  (Tr. 891.)  She reported feeling "unhappy with most aspects of her life" and "depressed at varying levels most days."  (*Id.*)  Little stated she experienced nightmares about verbal abuse she had suffered from her father and husband and began crying during the evaluation.  (*Id.*)  With regard to her daily activities, Little stated she shared most of the household chores with her husband but indicated she cleaned the bathroom, did laundry, and cooked.  (Tr. 892.)

Little also reported "she constantly worries about most aspects of her life."  (Tr. 891.)  She indicated "about once a week or so she feels overwhelmed with life and experiences a significant increase in her stress level."  (*Id.*)  Dr.  Spindler noted Little "seemed stressed throughout the interview."  (*Id.*)  He found "her comments suggest that she does not deal well

with conflicts with others and does not handle criticism very well." (*Id.*) Dr. Spindler concluded Little had "a lot of free-floating anxiety and very little self- confidence." (Tr. 892.) He found she was functioning within the average range of intelligence and "her judgment seem[ed] reliable for most routine matters." (Tr. 891.)

Dr. Spindler diagnosed persistent depressive disorder, mild to moderate; and generalized anxiety disorder, mild to moderate. (Tr. 892.) He found it "likely that with continued mental health services, [Little] will maintain or improve her current level of mental health and general functioning for the foreseeable future." (*Id.*) With regard to the four functional areas, Dr. Spindler opined as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

Based on clinical observations, her use of language and reported educational background, Elizabethann appears to be functioning in the average range of intelligence. She seems capable of understanding, remembering and carrying out instructions in most job settings.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

Elizabethann did not appear to have any major difficulty staying focused during this interview. She was able to recall five of five objects after five minutes and accurately recited six digits forward and four digits backward. She appears to have the mental ability to sustain a working pace and to maintain a level of attention and concentration that would be sufficient for most job settings.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in the work setting**.

Claimant reports that when she was employed she received average job performance ratings and had no major problem getting along with others. She may be seen by her coworkers as a rather needy person, but she seems capable of at least adequately tolerating supervision and coworkers.

23

**Describe claimant's abilities and limitations in responding  appropriately to work pressures in a work setting.**

Based on clinical observations and what the claimant has told the examiner, she appears to be handling the current stressors in her life moderately well.  She seems capable of handling routine work pressures.

(Tr. 893.)

On July 30, 2014, state agency psychologist Paul Tangeman, Ph.D., reviewed Little's medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  (Tr. 99-100, 103-105.)  In the PRT, Dr. Tangeman found Little had no restriction in her activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 100.)

In his RFC Assessment, Dr. Tangeman concluded Little had mild limitations in concentration and persistence.  (Tr. 104.)  He found she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, explaining she "can relate to others in a superficial manner and does not require more than routine supervision" but would "do best with a supportive supervisor."  (*Id*.)  Finally, Dr. Tangeman found Little was moderately limited in her ability to respond appropriately to changes in the work setting, indicating she "can adapt to infrequent changes in a relatively static work environment" with "no rapid pace."  (*Id*.)

On November 25, 2014, state agency psychologist Jennifer Swain, Psy.D., reviewed Little's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 115-116, 119-120.)  Dr. Swain reached the same conclusions as Dr. Tangeman.  (*Id*.)

**D.    Hearing Testimony**

During the June 17, 2016 hearing, the ALJ began by stating his questions would pertain to

24

the time period prior to Little's date last insured of September 2014.  Little testified regarding this

time frame, as follows:

- She lived in a house with her husband.  (Tr. 47-48.)  She "barely graduated" high school, and "flunked out" of her first year of college.  (Tr. 62.)

- She has previous work experience as a retail salesperson for floor covering and window treatments.  (Tr. 54.)  In this job, she worked with customers, estimated flooring needs, and placed orders.  (*Id.*)  She was on her feet for two to three hours per day, and lifted up to 40 to 50 pounds.  (Tr. 54-55.)

- In December 2010, she injured her neck and back in an accident.  (Tr. 48.)  She stopped working on July 28, 2011 and has not worked since.  (Tr. 50.)

- She had spinal fusion surgery in September 2013.  (Tr. 67.)  During the time period between her December 2010 accident and her surgery, she experienced excruciating pain in her neck, which radiated to her left upper extremity, thoracic region, and chest.  (Tr. 70-71.)  It took "a long time" to heal after her surgery. (Tr. 71.)  The surgery relieved "a lot" of her pain, and made her left arm feel "more reliable."  (Tr. 70-71.)  After her surgery, she participated in physical therapy and yoga.  (Tr. 67.)

- She continued to have pain and weakness in her left hand and arm, causing her to drop things.  (Tr. 68.)  She also had difficulty reaching overhead or to the sides. (Tr. 67.)

- Prior to September 2014, she experienced back pain due to several herniated discs.  (Tr. 66, 72.)  Every position hurt except for laying on her side.  (*Id.*)  The pain was so intense, it sometimes caused her to choke and vomit.  (Tr. 71-72.)

- She also experienced heart problems.  (Tr. 73.)  She had her first heart attack in 2012.  (Tr. 85.)  As a result of her heart issues, she experienced swelling, vertigo, and dizziness.  (Tr. 67.)

- She has been treated for depression and anxiety since she was twenty-six years old.  (Tr. 60.)  During the relevant time period, she had problems with thought clarity, concentration, focus, memory, executive functioning, and maintaining a train of thought.  (Tr. 51-52, 57.)  It took her longer to complete simple tasks (like bathing, doing chores, or making dinner) because she got "sidetracked." (Tr. 57, 61.)  In addition, she had difficulty brushing her teeth, bathing, and getting dressed because she was exhausted, overwhelmed, and "didn't care."  (Tr. 60-61, 75.)  She had difficulty concentrating on books and television shows.  (Tr. 62.)  She had daily crying spells.  (Tr. 75.)  Everything in life felt "grueling."

25

(Tr. 74.)

• Medication and counseling has helped control her mental health symptoms. (Tr. 58-59.)  Her treatment "kept [her] alive when [she] didn't want to be." (Tr. 58.) Although her treatment has "made a huge difference in her ability to function smoother," it "could be better." (Tr. 59.)

• She experiences side effects from her various medications, including dryness, rotting teeth, and fatigue. (Tr. 66.)

• Because of her impairments, she was unable to do household chores. (Tr. 60.) Her husband did the yard work, home repairs, and some of the chores. (*Id.*) A friend also came over to help with household chores and care for her pets. (*Id.*)

• Her husband became abusive shortly after they married. (Tr. 86.) She felt very isolated because of her husband's abusive behavior. (Tr. 64.) She has trouble relating to people. (Tr. 65.) During the relevant time period, she spent a good deal of her day writing in her journal. (Tr. 63.)

The VE testified Little had past work as a salesperson, floor coverings (light performed at medium, semi-skilled, SVP 4). (Tr. 78.)  The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical individual of the claimant's age and education and the past position you described.  Further assume that the hypothetical individual is limited to light [work], the postural limitations to include frequent climbing of ramps and stairs, never to climb ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch, and occasional crawl.  The mental limitations [are] frequent interaction with supervisors, coworkers and the public, and limited to . . . simple, infrequent changes in the work setting.

(Tr. 79.)  The VE testified the hypothetical individual would not be able to perform Little's past work as a floor coverings salesperson, but would be able to perform other representative jobs in the economy, such as housekeeping, cleaner (light, unskilled, SVP 2); merchandise marker (light, unskilled, SVP 2); and routing clerk (light, unskilled, SVP 2).  (Tr. 79-80.)

The ALJ then posed a second hypothetical, as follows:

[A]ssume the same limitations that I have described in hypothetical #1 but adding

26

in a [sic] modifying to it as follows:  Occasional reaching overhead with the left and the right, frequent reaching in all other direction with the left and the right, occasional climbing of ramps and stairs, balance, stoop, kneel, crouch, never to be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle.  The mental limitations [are:] limited to performing simple, routine and repetitive tasks but not at a production rate pace, i.e., assembly line work, limited to simple work-related decisions in using her judgment and dealing with changes in the work setting, be able to frequently interact with supervisors, coworkers and the public.

(Tr. 80-81.)  The VE testified the individual would be able to perform the three previously identified jobs; i.e., housekeeping, cleaner; merchandise marker; and routing clerk.  (Tr. 81.)

The ALJ then asked a third hypothetical that was the same as the second but modified the exertional level to sedentary.  (Tr. 81.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy such as document preparer (sedentary, unskilled, SVP 2); final assembler (sedentary, unskilled, SVP 2); and circuit inspector (sedentary, unskilled, SVP 2).  (*Id*.)

The ALJ then asked a fourth hypothetical that modified both the second and third hypotheticals by limiting the individual to occasional interaction with coworkers and no interaction with the public.  (*Id*.)  The VE testified the hypothetical individual would be able to perform the representative jobs identified in response to the second and third hypotheticals.  (Tr. 82.)

Finally, the ALJ asked a fifth hypothetical "adding that the hypothetical individual would be off task 20% of an eight hour workday in addition to normal work breaks and are absent from work two days per month."  (Tr. 82.)  The VE testified "either of those conditions would preclude employment."  (*Id*.)

Little's counsel then asked a series of hypothetical questions.  Counsel's first hypothetical

27

question was as follows:

> I'd like you to assume the basic limitations set forth in hypothetical #1 but I'd like you to factor in upper extremity limitations.  And I'd like you to assume that the claimant would be able to use her upper extremities bilaterally on less than occasional basis for reaching in all directions as well as fine and gross manipulation.  In your opinion, would that limitation allow for the performance of any competitive work?

(Tr. 82-83.)  The VE testified "if it's restricted to less than occasional, no, there would not be any work."  (Tr. 83.)

Counsel then asked the VE to assume the ALJ's first hypothetical with the additional limitation that "in order to accommodate symptoms, including pain and fatigue, that the claimant would require two additional breaks during the course of the workday which would last for at least a half hour, and that would be in addition to the regularly scheduled lunch and morning afternoon breaks."  (Tr. 83.)  The VE testified such a limitation would not be consistent with competitive work.  (*Id.*)

Finally, counsel asked the VE to assume the ALJ's first hypothetical but with the additional limitation that "in order to stay on task, . . . the claimant would require direct supervision and redirection a third of a normal workday and workweek, in other words this would be direct over-the-shoulder supervision."  (*Id.*)  The VE testified such a limitation would preclude employment.  (Tr. 84.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

28

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Little was insured on her alleged disability onset date, July 28, 2011, and remained insured through September 30, 2014, her date last insured ("DLI.")  (Tr. 13.)  Therefore, in order to be entitled to POD and DIB, Little must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 28, 2011 through her date last insured of September 30, 2014 (20 CFR 404.1571 et seq.)

3.    Through the date last insured, the claimant had the following severe impairments:  disc herniation at L3-4, L4-5, and L5-S1 with radiculitis/radiculopathy of the L5 and S1 nerve root; residual effects of status-post C5-7 fusion with mild C6-7 neuroforaminal stenosis from uncovertebral hypertrophy; coronary artery disease with history of PTCA; depression; and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a reduced range of light work with the following limitations (see generally 20 CFR 404.1567(b)).  She could lift, carry, push, and pull 20 pounds frequently and 10 pounds occasionally.  She could sit, stand, and walk 6 hours each of an eight-hour workday. She could reach overhead occasionally with the left and right upper extremities.  She could reach in all other directions frequently with the left and right upper extremities.  She could occasionally climb ramps and stairs.  She could never climb ladders,

30

ropes, or scaffolds.  She could occasionally  balance, stoop, kneel, crouch, and crawl. She could never be exposed to unprotected heights, moving mechanical parts, and operating a motor vehicle.  Mentally, she was limited to simple, routine, and repetitive tasks but not at a production rate pace (i.e., assembly line work). She was further limited to simple work-related decisions in using her  judgment and dealing with work changes in the work setting. She was limited to frequent interactions with coworkers, supervisors, and the public.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on January *** 1967 and was 47 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from July 28, 2011, the alleged onset date, through September 30, 2014, the date last insured (20 CFR 404.1520(g)).

(Tr. 13-27.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at *

2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the

Commissioner's decision is supported by substantial evidence and was made pursuant to proper

legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physicians Drs. Nickels and Vazquez*

In her first assignment of error, Little argues the ALJ failed to articulate "good reasons" for discounting the opinions of her treating pain management physician Dr. Nickels and her treating psychiatrist Dr. Vazquez.  (Doc. No. 12 at 8-11.)  She maintains the ALJ mischaracterized the evidence and "selectively [chose] sections of the record to support his conclusion of non-disability."  (*Id*. at 10.)

33

The Commissioner argues remand is not required. (Doc. No. 14 at 14-21.)  With regard to Dr. Nickels' opinion, she maintains the ALJ "properly concluded that his opinion could not be afforded controlling weight because, while Plaintiff's back impairments were visualized on diagnostic imaging, his opinion was inconsistent with the evidence of record as a whole," including evidence she received conservative treatment for her physical impairments, experienced relief after her September 2013 neck surgery, and was capable of engaging in a "full array of daily activities."  (*Id*. at 17-18.)  With regard to Dr. Vazquez's opinion, the Commissioner argues the ALJ did not err in discounting his opinion in light of evidence she "received good results from her mental health treatment," "maintained a full array of daily activities," and had normal mental status examination findings.  (*Id*. at 19.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[10]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[11]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §

---

[10] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[11] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[12]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at

---

[12] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not

accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of

Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391

(6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner

makes the determination whether a claimant meets the statutory definition of disability.  This

necessarily includes a review of all the medical findings and other evidence that support a

medical source's statement that one is disabled.  "A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.  It

is the Commissioner who must make the final decision on the ultimate issue of disability.

*Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1

(11th Cir. 1982).

The Court will address the parties' arguments regarding the ALJ's evaluation of Dr.

Nickels' and Dr. Vazquez's opinions separately, below.

### Dr. Nickels

36

As noted *supra*, Dr. Nickels submitted a letter and completed a questionnaire regarding Little's physical impairments on July 20, 2015.  (Tr. 950-958.)  In his letter, Dr. Nickels provided a lengthy description of Little's symptoms, pain complaints, and treatment course from 2004 until the date of his opinion.  (Tr. 950-951.)  In the questionnaire, Dr. Nickels concluded Little could (1) stand for 2 hours total and for 30 minutes at one time during an 8 hour workday; (2) walk for 2 hours total and for 30 minutes at one time during an 8 hour workday; (3) sit for 4 hours total and for 30 minutes at one time during an 8 hour workday; (4) lift up to 10 pounds occasionally; (5) occasionally bend; (6) occasionally climb; (7) never squat or crawl; and (8) never reach above shoulder level.  (Tr. 953-954.)  He also opined Little could not use her feet for repetitive movements in foot controls, push/pull, or engage in fine manipulation.  (*Id.*)  Dr. Nickels found Little would be expected to miss two or more days of work per month due to pain, fatigue, medication/treatment side effects or other symptoms.  (Tr. 954.)  He also expressly concluded Little's functional limitations had been present since her July 28, 2011 onset date.  (*Id.*)

Dr. Nickels also completed a separate questionnaire regarding Little's upper extremity limitations.  (Tr. 956-957.)  He opined Little could "seldom" engage in gross and fine manipulation bilaterally, and never engage in any reaching bilaterally.  (*Id*.)  The term "seldom" was defined on the form as denoting a "serious limitation, i.e., difficulty tying shoes, writing, buttoning clothes, able to grasp and lift only very small (less than 5 pounds) objects on a sporadic basis."  (*Id*.)  Again, Dr. Nickels expressly concluded these particular limitations had been present since Little's July 28, 2011 onset date.  (*Id*.)

The ALJ evaluated Dr. Nickels' opinion as follows:

> The undersigned gives less weight to Dr. Nickels's treating source statement (Ex. B21F).

37

A treating physician's medical opinion cannot be given "controlling weight" "unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques" (SSR 96-2p).  Moreover, "even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other 'substantial evidence' in the case record" (SSR 96-2p; see also 20 CFR 404.1502 and 404.1527).

In the claimant's case, the undersigned finds that, although the evidence corroborates the nature of the claimant's severe impairments as Dr. Nickels indicated, his opinion regarding disabling severity of these impairments were [sic] not consistent with the claimant's actual response to conservative and surgical treatment modalities as they related to the period prior [to] September 30, 2014, as evidenced by his own longitudinal  physical examination findings and Dr. Steinmetz's opinion that the claimant was in post-surgical recovery plateau six months after her surgery in September 2013 (Ex. B21F; but see Exs. B9F, p. 23; B13F; see generally B24F).

Accordingly, the undersigned gives less weight to Dr. Nickels's opinion from 2015.

(Tr. 23.)

For the following reasons, the Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Nickels' July 2015 opinion.[13]  As an initial matter, the ALJ failed to adequately evaluate Dr. Nickels' opinion with respect to the time period prior to Little's September 2013 neck surgery.  Specifically, the ALJ fails to cite any specific medical evidence (at any point in the decision) to support his conclusion that Little's "response to conservative . . . treatment modalities" is inconsistent with the specific functional limitations set forth in Dr. Nickels' July

---

[13] The Commissioner does not contest that Dr. Nickels was Little's treating physician during the time period at issue; i.e., July 28, 2011 through September 31, 2014.  It is further undisputed the ALJ rejected virtually all of Dr. Nickels' specific opinions regarding Little's physical functional limitations, including his opinions that she could stand and walk for no more than 2 hours total each and for no more than 30 minutes each during an 8 hour workday; sit for no more than 4 hours total and for no more than 30 minutes during an 8 hour workday; lift no more than 10 pounds occasionally; never squat or crawl; never reach with her bilateral arms; and seldom engage in fine and gross manipulation.

2015 opinion.  This is problematic given the many abnormal physical examination findings in the treatment record, as documented both by Dr. Nickels and Little's chiropractor Mr. Bennett.

As set forth *supra*, prior to Little's neck surgery, Dr. Nickels repeatedly noted tenderness in Little's cervical and/or lumbar spines with muscle spasm; reduced cervical and/or lumbar range of motion; and positive compression testing bilaterally.  (Tr. 667, 660, 681-685.) Little's chiropractor, Mr. Bennett, also observed numerous abnormal findings on physical examination during this time period, including (1) difficulty changing positions from sitting to standing; (2) pain upon palpation over the lower cervical and upper thoracic spine with associated paraspinal myospasms and guarding; (3) muscular spasms and pain upon palpation through the lumbosacral spine with extension into the left SI joint and hip; (4) increased pain with range of motion; (5) pain with straight leg raise testing; (6) positive Kemp's test bilaterally; (7) positive shoulder depression testing bilaterally; (8) positive Jackson's and Spurling's compression tests bilaterally; (10) reduced strength in Little's left elbow; and (11) reduced strength and endurance through her cervical and lumbar spines.  (Tr. 584-586, 581-582, 575-576, 567-568, 560-561, 554-555, 548-549, 551-552, 466-467.)

Moreover, the abnormal physical examination findings noted above appear to be consistent with Little's pre-surgery objective test results.  Specifically, the record reflects the following abnormal imaging results:

- An MRI of Little's lumbar spine from December 2010 showed (1) multilevel discogenic changes of the lumbar spine with bulging disc from L3 through S1; (2) suspected small broad based disc protrusion at L4-5 and L5-S1; (3) mild to moderate narrowing of the central canal at the L4-5 level and mild narrowing of the central canal at L3-4; (5) disc material at L4-5 that "may contact the transiting L4 nerve root on the right, though there is no displacement of the nerve root."  (Tr. 412-413.)

39

- An x-ray of Little's cervical spine taken January 13, 2011 showed congenital anterior fusion at C5-6; mild deformity of the C5 and C6 vertebral bodies; mild disc space narrowing of C6-7; and mild bony neural foraminal stenosis on the left at C4-5 and C5-6. (Tr. 410.)

- An MRI of Little's cervical spine taken October 27, 2011 showed (1) congential block vertebra at C5-6; and (2) a broad based left central disc herniation at C6-7. (Tr. 318-319.)

- An April 23, 2012 NCS of Little's upper extremities showed bilateral cervical radiculitis, bilateral thoracic outlet syndrome, and mild nerve compression on the right consistent with carpal tunnel syndrome. (Tr. 596-597.)

- An August 20, 2012 MRI of Little's lumbar spine showed 4 mm disc herniations at L3-4, L4-5, and L5-S1. (Tr. 594-595.)

- An August 22, 2012 NCS of Little's bilateral lower extremities revealed radiculitis/radiculopathy of the L5 and S1 nerve roots. (Tr. 588-590.)

- An April 4, 2013 x-ray of Little's lumbar spine showed disc space narrowing at L3-4 and L5-S1. (Tr. 475.)

The ALJ fails to sufficiently explain how any of the specific functional limitations set forth in Dr. Nickels' July 2015 opinion are inconsistent with the medical evidence noted above.[14]

The Sixth Circuit has made clear that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for rejecting these opinions. *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's

---

[14] The ALJ's reliance on Little's "response to conservative treatment" is particularly perplexing (at least with respect to the over two year time period prior to her surgery) given that her physicians ultimately determined conservative measures were insufficient to address her pain and recommended surgery on her cervical spine. (Tr. 612, 605-607.)

40

conclusion that gets the short end of the stick.")[15]  Here, while the ALJ recited some of the

medical evidence earlier in the decision, he failed to offer any *explanation* for his conclusion Dr.

Nickels' opinion was inconsistent with that evidence.  This is significant because much of the

medical evidence appears capable of supporting serious functional limitations.  As courts within

this District have held, an ALJ's recitation of the medical evidence "does not cure the failure to

offer any meaningful analysis as to why the opinions of treating physicians were rejected."

*Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013).  Simply put, this Court

cannot conduct a meaningful review and conclude that good reasons have been set forth for

rejecting a treating physician's opinion where an ALJ recites some of the pertinent evidence of

record and follows that recitation with an unexplained conclusion that said opinion is

inconsistent with the medical record.  *See Blackburn*, 2013 WL 3977282 at * 7; *Cassels v.

Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016).

      The Court further notes that, while the ALJ references some of the medical evidence

regarding the time period prior to Little's September 2013 neck surgery, the decision fails

entirely to acknowledge or address the many abnormal physical examination findings in the

record.  Courts have not hesitated to remand where an ALJ selectively includes only those

portions of the medical evidence that places a claimant in a capable light, and fails to

---

[15] *See also Rogers* , 486 F.3d at 245–46; *Patterson v. Astrue*, 2010 WL 2232309
(N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale
beyond his conclusory statement that [the treating physician's] opinion is inconsistent
with the objective medical evidence and appears to be based solely on [claimant's]
subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio
Apr.23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ
discarded a treating physician's opinion without identifying any contradictory evidence or
explaining which findings were unsupported).

acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec*., 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec*., 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Smith v. Comm'r of Soc. Sec*., 2013 WL 943874 at * 6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec*., 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

With respect to the time period post-dating Little's September 2013 surgery (i.e., September, 23, 2013 through September 30, 2014), the Court also finds the ALJ failed to provide "good reasons" for discounting Dr. Nickels' opinion.  Again, the only reason provided by the ALJ for rejecting Dr. Nickels' opinion is that it is inconsistent with Little's "actual response to conservative and surgical treatment modalities as they related to the period prior September 30, 2014, as evidenced by his own longitudinal physical examination findings and Dr. Steinmetz's opinion that the claimant was in post-surgical recovery plateau six months after her surgery in September 2013."  (Tr. 23.)

The ALJ does not discuss any specific medical evidence at step four regarding Little's post-surgical recovery and treatment that might support this conclusion.  At step three, however, the ALJ does recite some of the medical evidence, including treatment notes indicating (1) Little was "overall pleased" with the results of her surgery in December 2013; (2) Dr. Steinmetz found

42

she had reached a "recovery plateau" as of December 20, 2013; (3) Little reported her neck head,

dorsal spine, and bilateral shoulder pain was "intermittent" as of April 2014; (4) Dr. Steinmetz

found improvement in Little's upper extremity pain symptoms as of August 2015; and (5)

objective evidence indicated normal strength in Little's left lower extremity in April 2014.  (Tr.

17-18.)  For the following reasons, the ALJ's recitation of this medical evidence at step three

does not provide "good reasons" for rejecting Dr. Nickels' opinion with respect to the period

post-dating Little's neck surgery.

First, while the ALJ recites medical evidence indicating Little experienced relief with

respect to her neck and upper extremity pain as a result of her September 2013 neck surgery, he

fails to sufficiently acknowledge or address objective medical evidence relating to her ongoing

complaints of severe *lumbar* pain.  Specifically, the ALJ fails to acknowledge that Dr. Nickels

consistently observed abnormal physical examination findings relating to Little's lower back

after her neck surgery, including antalgic gait and limping, exaggerated lumbar lordosis,

tenderness and reduced range of motion in Little's lumbar spine, and positive straight leg raise

on the right.  (Tr. 652-655, 648-651, 643-647, 632-635.)  These findings were noted at each of

Little's post-surgical visits to Dr. Nickels on November 5, 2013, December 3, 2013, January 7,

2014, February 4, 2014, and March 4, 2014.  (*Id*.)  Moreover, in April 2014, Dr. Steinmetz noted

Little was "still having considerable lumbar pain" and prescribed facet blocks.  (Tr. 417.)  That

same month, Dr.  Nickels examined Little on two occasions, both times again finding antalgic

gait and limping, exaggerated lumbar lordosis, tenderness and reduced range of motion in

Little's lumbar spine, and positive straight leg raise.  (Tr. 623-631.)  Dr. Nickels administered

facet steroid injections in Little's lumbar spine in January 2015.  (Tr. 968-971.)

43

The ALJ does not acknowledge this evidence at any point in the decision.  Nor does he sufficiently address the fact that, despite reports of some improvement after her surgery, Little continued to complain of ongoing neck and upper extremity pain.  (Tr. 643-647, 639-643, 623-625, 627-629.)  The decision also fails to acknowledge post-surgery imaging of Little's cervical spine that continued to reveal abnormal findings.  Specifically, a March 2014 CT scan of her cervical spine showed "borderline significant left neuroforaminal stenosis" in the C6-7 region.  (Tr. 587.)  An August 2014 MRI of Little's cervical spine showed a left central disc herniation at C4-5.  (Tr. 979-980.)  Several months later (and after her DLI), Little underwent another MRI of her cervical spine, which revealed disc bulging at C4-5.  (Tr. 1255.)

The ALJ does not sufficiently explain how any of the specific functional limitations set forth in Dr. Nickels' July 2015 opinion are inconsistent with the medical evidence noted above.  Indeed, the ALJ failed to acknowledge the majority of this evidence.  As discussed *supra*, an ALJ may not selectively include only those portions of the medical evidence that places a claimant in a capable light, and fail to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry*, 741 F.3d at 724; *Germany–Johnson*, 313 Fed. App'x at 777; *Smith*, 2013 WL 943874 at * 6;  *Johnson*, 2016 WL 7208783 at * 4.  Here, the ALJ did exactly that, leaving this Court uncertain as to whether he properly considered such evidence in evaluating Dr. Nickels' opinion.

The Commissioner nonetheless argues remand is not required because (1) Little maintained a "full array" of daily activities; (2) Dr. Nickels' opinion was an "opinion on the [ultimate] issue of disability" and therefore not entitled to any weight; and (3) Dr. Nickels' opinion is dated July 2015, which is well after Little's September 2014 DLI.  These arguments

44

are without merit for several reasons.

As an initial matter, the ALJ did not articulate any of the above reasons as a basis for rejecting Dr. Nickels' July 2015 opinion.  It is well-established the Commissioner cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  Indeed, as courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn*, 2013 WL 3967282 at * 8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Because the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for rejecting Dr. Nickels' opinion, they are rejected as *post hoc* rationalizations.

More importantly, the reasons offered by the Commissioner are not supported by substantial evidence.  With respect to Little's daily activities, the Court notes the ALJ failed to acknowledge Little's testimony and statements that a friend helped her complete the majority of her household chores.  (Tr. 60, 256.)  Specifically, in a Function Report dated May 8, 2014, Little indicated a friend helps her grocery shop, cook, clean and take care of her pets.  (Tr. 256.)  During the hearing, Little reiterated that "a really good friend of mine comes over and we'll pay him to do my laundry and . . . . do the floors, help me try to organize my life, help me with my animals."  (Tr. 60.)  Little stated, both in her Function Report and during the hearing, that it is painful and exhausting for her to engage in personal care and complete chores and, further, that it takes extra time to complete tasks due to her physical and mental impairments.  (Tr. 60-61, 257.)  Little indicated she pushes herself to complete as much work around the house as possible in

order to avoid abuse from her husband.[16]  (Tr. 256-257.)

The Court also rejects the Commissioner's argument Dr. Nickels' opinion "did not deserve any weight" because it was an opinion on the ultimate issue of disability.  (Doc. No. 14 at 18.)  However, as discussed *supra*, Dr. Nickels offered specific functional limitations in the questionnaire attached to his July 2015 letter, including that Little could (1) stand for 2 hours total and for 30 minutes at one time during an 8 hour workday; (2) walk for 2 hours total and for 30 minutes at one time during an 8 hour workday; (3) sit for 4 hours total and for 30 minutes at one time during an 8 hour workday; (4) lift up to 10 pounds occasionally; (5) occasionally bend; (6) occasionally climb; (7) never squat or crawl; and (8) never reach above shoulder level.  (Tr. 953-954.)  He also opined Little could not use her feet for repetitive movements in foot controls or push/pull; and could only "seldom" engage in gross and fine manipulation bilaterally, and never engage in any reaching bilaterally.  (Tr. 953, 956.)  The Court finds these opinions represent assessments of the nature and scope of Little's physical functional abilities and limitations and, therefore, do not represent an opinion on the ultimate issue of whether Little is disabled.

Finally, the Commissioner argues the ALJ properly rejected Dr. Nickels' opinion because it was completed in July 2015, several months after Little's DLI.  A treating physician's opinion rendered after the DLI "may be considered to the extent [that] it illuminates a claimant's health before the expiration of his insured status."  *Nagle v. Com'r of Soc. Sec.*, 1999 WL 777355 at * 1 (6th Cir. Sept. 21, 1999) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).  *See*

---

[16] The Court has serious concerns regarding any suggestion that a claimant's ability to complete certain minimal household chores in order to avoid domestic abuse by a spouse constitutes an appropriate basis to reject a treating physician's opinion.

*also Morgan v. Comm'r of Soc. Sec*., 2018 WL 849478 at * 10 (S.D. Ohio Feb. 14, 2018). "However, to be given significant weight, this retrospective opinion must be supported by relevant, objective evidence that was contemporaneous to the insured period." *Stark v. Com'r of Soc. Sec*., 2016 WL 1077100 at *6 (N.D. Ohio March 18, 2016) (citing *Strong v. Soc. Sec. Admin*., 88 Fed. Appx. 841, 845 (6th Cir. 2004)).

Here, Dr. Nickels' opinion clearly "illuminates" Little's health before her DLI.  It is undisputed Dr. Nickels consistently treated Little throughout the time period in question; i.e. between July 28, 2011 and September 30, 2014.  Indeed, the letter portion of Dr. Nickels' opinion specifically describes Little's symptoms and treatment during the period in question. (Tr. 950-951.)  Further, Dr. Nickels specifically states in the questionnaires attached to his letter that the functional limitations set forth therein have "been present since July 28, 2011, Ms. Little's alleged onset date of disability." (Tr. 954, 957.)  Moreover, and as discussed at length *supra,* Dr. Nickels' opinion is supported by relevant, objective evidence from the relevant period; i.e., between July 2011 and September 2014.  Under these circumstances, the Court rejects the Commissioner's argument Dr. Nickels' opinion was "incapable of showing that [Little] had disabling limitations during the relevant time period."[17]  (Doc. No. 14 at 18.)

In sum, the Court finds the ALJ failed to set forth "good reasons" for rejecting Dr.

---

[17] *See also, Lanich v. Comm'r of Soc. Sec.*, 2015 WL 4540391 at * 5 (S.D. Ohio Jan. 13, 2015) (where treating physician opinion was dated after claimant's DLI, stating that "simply noting the date of the opinion cannot be considered a 'good reason' for rejecting it without any analysis as to whether it 'sheds light on [P]laintiff's condition prior to [her DLI].' . . . This is particularly true in light of the frequency of treatment and longevity of the treating relationship that began in November 2005, while Plaintiff was still insured for Social Security purposes.) (quoting *Vanarnam v. Comm'r of Soc. Sec*., 2014 WL 1328272, at *20 (E.D.Mich. Mar. 28, 2014)).

Nickels' July 2015 opinion.  Accordingly, the Court recommends a remand is necessary, thereby

affording the ALJ the opportunity to properly address the physical functional limitations

assessed by Dr. Nickels therein.

### *Dr. Vazquez*

Little also argues the ALJ erred in discounting the opinion of her treating psychiatrist,

Dr. Vazquez.  As noted above, on October 2, 2014, Dr. Vazquez completed a Mental RFC

questionnaire, in which he found Little was markedly limited in her abilities to (1) perform and

complete work tasks in a normal workday or workweek at a consistent pace; (2) work in

cooperation with or in proximity to others without being distracted by them; (3) carry through

instructions and complete tasks independently; (4) maintain attention and concentration for more

than brief periods of time; (5) perform at production levels expected by most employers; (6)

behave predictably, reliably and in an emotionally stable manner; (7) maintain personal

appearance and hygiene; and (8) tolerate customary work pressures.  (Tr. 896-899.)  Dr. Vazquez

also found Little was moderately limited in a number of other mental categories.  (*Id*.)

The ALJ evaluated Dr. Vazquez's opinion as follows:

> Based on the rules and regulations regarding the treating physician rule that the
> undersigned has described above, the undersigned gives less weight to Dr. Vazquez's
> opinion that the claimant had moderate and mostly marked limitations in her mental
> functioning despite her compliance with psychotropic medications because the
> claimant's own reported abilities related to managing the household funds for grocery
> shopping and the performance of all household chores due to her husband's reported
> abusive nature and despite the painful effects of her physical condition establish less
> restrictive mental limitations than he opined (Ex. B15F; but see Ex. B5E, pp. 2-3;
> B14F; SSR 96-2p; see also 20 CFR 404.1502 and 404.1527).

(Tr. 24.)  The ALJ accorded "considerable weight" to the opinion of consultative examiner Dr.

Spindler because "although he opined and he observed that the claimant had mild to moderate

48

effects from depression and anxiety, they did not impose episodes of decompensation that would preclude her from 'most jobs.'" (*Id.*)

The Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Vazquez's October 2014 opinion.[18]  The ALJ rejected Dr. Vazquez's opinion on the basis it was inconsistent with Little's ability to manage household funds and perform "all household chores due to her husband's reported abusive nature and despite the painful effects of her physical condition." (Tr. 24.)  However, as discussed *supra*, the ALJ failed to acknowledge or address Little's statements that a friend helped her complete the majority of her household chores, including grocery shopping, cooking, cleaning, and taking care of her pets. (Tr. 60, 256.)  More significantly, the ALJ failed to explain how Little's ability to perform certain minimal household chores in order to avoid domestic abuse demonstrates she is not markedly limited in the specific functional areas identified by Dr. Vazquez.

The ALJ's failure to sufficiently articulate his reasoning is particularly troublesome given his failure to discuss or evaluate much of the medical evidence regarding Little's mental impairments.  The ALJ provides no meaningful discussion of these records at step four of the decision.  At step three, the ALJ discusses Little's mental impairments in the context of determining whether she meets or equals the requirements of Listings 12.04 and/or 12.06. (Tr. 19-20.)  At no point, however, does the ALJ acknowledge or discuss the many abnormal mental status examination findings in the record, including depressed mood, constricted affect, unkempt appearance, limited insight, and poor judgment. (Tr. 1146, 1148, 1144, 1142, 1143.)  The ALJ

_____

[18] The Commissioner does not contest that Dr. Vazquez was Little's treating psychiatrist during the relevant time period.  Further, the ALJ recognizes him as such in the decision.

also failed to acknowledge that Little's home health care treatment records from late 2013 indicate she suffered from an "impaired mental state," with symptoms including indecisiveness, lack of concentration, diminished interest in most activities, and poor coping skills.  (Tr. 804, 809, 815-816.)  Nor does he acknowledge Little's home health care providers generally described her as tearful, depressed, and stressed, or that Dr. Vazquez noted frequent crying episodes and extended her home health care regimen twice.[19]  (Tr. 822, 805, 801, 797, 794, 790, 774, 770, 711-714, 715-717.)   The ALJ does not discuss this evidence or explain how it is inconsistent with the specific functional limitations set forth in Dr. Vazquez's October 2014 opinion.

Accordingly, the Court finds the ALJ failed to set forth "good reasons" for rejecting Dr. Vazquez's October 2014 opinion.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the mental functional limitations assessed by Dr. Vazquez therein.

### *Credibility*

In her second assignment of error, Little argues the ALJ's credibility determination is not supported by substantial evidence.  (Doc. No. 12 at 11-13.)  She maintains the ALJ failed to take into account the fact it takes her "an excessive amount of time" to complete the household chores she is able to perform.  (*Id*.)  Little also argues her "minimal daily functions" are not comparable to typical work activities.  (*Id.*)

---

[19] Indeed, it appears the ALJ did not recognize Little's home health care regimen was prescribed to address, not only her physical recovery after surgery, but also her mental condition.  The record reflects the primary diagnosis identified by Dr. Vazquez in authorizing home health care was anxiety.  (Tr. 707.)

The Commissioner argues the ALJ properly evaluated Little's credibility.  (Doc. No. 14.)  She argues the ALJ found Little's complaints were not consistent with the record based on a variety of factors, including the "conservative aspects of her treatment, the efficacy of her treatment, her part-time work following her December 2010 injury, the credible medical source opinions of record, her daily activities, and other evidence."  (*Id*. at 22.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 96–7p, 1996 WL 374186 (July 2, 1996).[20]  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the

---

[20]  SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the June 17, 2016 hearing.  Little appears to suggest  SSR 16-3p applies retroactively.  (Doc. No. 12 at 12, citing SSR 16-3p). The Commissioner does not address the issue.  As discussed *infra*, the Court need not reach the parties' arguments regarding the ALJ's credibility analysis, as remand is recommended to allow the ALJ to properly address the opinions of Drs. Nickels and Vazquez.  Accordingly, the Court need not determine whether SSR 16-3p applies retroactively herein.

objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 23, 2005).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose Section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").[21]

As it is recommended this matter be remanded to allow the ALJ the opportunity to properly address the opinions of Drs. Nickels and Vazquez, the Court need not address the

---

[21] SSR 16-3p similarly provides that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

parties' arguments with respect to the ALJ's credibility analysis.  However, given the fact the ALJ misstated the evidence regarding the nature and scope of Little's daily activities, it is recommended on remand the ALJ revisit his credibility analysis based on an accurate discussion of Little's statements and testimony regarding this issue.

***RFC***

In her final assignment of error, Little argues the RFC is not supported by substantial evidence, with respect to either her physical or mental impairments.  (Doc. No. 12 at 13-15.) The Commissioner argues the ALJ did not err in finding Little could perform other work in the economy at step five of the sequential evaluation process.  (Doc. No. 14 at 24-25.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[22]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774

---

[22] This regulation has been superseded for claims filed on or after March 27, 2017.  As Little's application was filed in March 2014, this Court applies the rules and regulations in effect at that time.

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p at *7, 1996 WL 374184(SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

As the undersigned has recommended this matter be remanded for further consideration of the opinions of treating physicians Drs. Nickels and Vazquez, it is possible the ALJ's RFC determination may change on remand.  Thus, the Court will not address all of the parties' arguments regarding the alleged deficiencies in the ALJ's discussion of the medical evidence at step four.  On remand, however, it is recommended, the ALJ conduct a thorough and complete review of the medical evidence relating to Little's physical and mental impairments, including evidence relating to her ongoing cervical and lumbar pain, as well as her complaints of depression, anxiety, and concentration deficits.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

 

       *s/Jonathan D. Greenberg*
       Jonathan D. Greenberg
       United States Magistrate Judge

Date: June 4, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**